Case number 17-1124 et al., Matson Terminals Inc. Petitioner v. National Labor Relations Board. Mr. Gay for the petitioner, Mr. Jost for the respondent. Mr. Gay for the petitioner, Mr. Jost for the respondent. Good morning, Your Honors. My name is Christopher Gay for Petitioner of Matson Terminals. The issue in this case is whether Matson's supervisors on the Big Island of Hawaii are statutory supervisors under the National Labor Relations Act. Matson's position is that the Board lacked substantial evidence in finding that these individuals are not statutory supervisors. In particular, the Board failed to take into account and adequately explain the evidence in the record that detracts from the Board's findings. Now, as this Court recognized in the oil workers' decision, once the existence of supervisory authority is established, the degree or frequency of exercise is of little consequence. This record certainly does show the existence of statutory authority, and it does, in addition, show frequency. Now, our briefs address several supervisory functions, but this morning I'd like to focus on rewarding and assigning. And I'll cite the specific examples in the record that are undisputed and that the Board has failed to adequately explain. As to rewarding, the authority to reward clearly exists in the record. For instance, Michael Late, when he was a supervisor, created unilaterally his own benchmarks for rewarding the longshoremen. In particular, he decided on his own that if a longshoreman met his productivity benchmark of a certain number of container moves, what do you make of the Board's argument that it discounts the perspective of former employees in favor of the testimony of current? Our response to that is certainly there are numerous supervisors who are aware of and exercise this authority, including current supervisors. So we have the testimony and evidence from two individuals who were formerly supervisors. That's Mr. Late and Mr. Bell. That is further supplemented by evidence that even current supervisors are exercising this authority. But I also want to note that with regards to Mr. Late, he was a supervisor only one month before the hearing. With regards to Mr. Bell, he was a supervisor only four months before the hearing. So this is not a case. What I'm asking is I understand that the Board has taken the position that it privileges the testimony of current employees over past employees. Is it free to do that? Is there something amiss in its reasoning there? Well, I'm not aware that there is, that this Court has adopted such a bright-line rule that says we have to discount the testimony of individuals. I thought that was their position. I thought that was the Board's position. Maybe I've misstated it. Yeah, I'm not aware that the Board has set that forth as a bright-line rule. So, for example, if you look at the Avanta case from the Board that's cited in General Counsel's brief, I believe if you look at the dates in that case, the director of nursing hadn't held the charge nurse position for about two years prior to the hearing. And I can see if the witness hasn't held the position for a year or so, that would be a concern. But here, again, what we're talking about is the testimony of individuals who held the position in Mr. Late's case only one month before the hearing, in Mr. Bell's case only four months before the hearing. And we would submit it would be extremely form over substance to draw a bright line and discount their testimony based upon the serendipity of just a few weeks. And it's really the authority that adheres in the position, not the person. So they've given testimony as to what they were doing in that position, again, only several weeks or several months before the hearing. In addition, there is also evidence that the terminal managers have been and continue to be aware of the supervisors having that authority. Mr. Shimabukuro, when he was the terminal manager, testified to such a fact. And Mr. Late succeeded to that position as terminal manager and indicated he was still aware that the supervisors had that authority. And there was also some testimony that even the current supervisors, several of the current supervisors have talked about exercising that authority. But Mr. Napoli said that he didn't do it and he was never told he had authority to do it. He did say that. And our position is that, again, if you look at Mr. Late's testimony, Mr. Bell's testimony, and the testimony that relates to other current supervisors, there is enough to show that that authority is recognized. Well, there might be enough, which would mean there would be substantial evidence to support the board if they went your way. But the only issue for us is whether there's substantial evidence to support the board in the way that it did go. Right, and we would have to look at the evidence that detracts from the board's finding as part of that substantial evidence. Right, and they say it's both, and they gave more weight to existing supervisors. When you said, you opened by saying that Mr. Late, is that how you pronounce it, Late? Mr. Late, yes. Late, that he did it on his own. So if a supervisor does something on his own without authority, does that constitute authority to reward? Well, we submit that he does have authority. I appreciate that, but if he didn't or if he did it on his own, as you said, that wouldn't establish authority to reward. I think you would have to look at essentially if the company approves or ratifies or acquiesces in it because then it really does become authority. And in this case, again, the terminal managers were aware of the supervisors doing this and had absolutely no problem with it. And also with regards to the issue of independent judgment, which is a critical issue, we have the evidence that Mr. Late decided to reward the longshoremen in a particular way. He decided that if they were particularly productive and they finished those container moves within a certain period of time and they were fast, he would reward them by tacking on time. And given the high hourly rate for the longshoremen and the overtime premium, that's not an insignificant amount of compensation. And the record shows that Mr. Late did this about twice a month. Now, Mr. Bell, as a supervisor, unilaterally decided to reward the men in a different way. He decided that if the men actually worked a longer period of time beyond their schedule hours, he would tack on time and reward them. So we think there could not be a clearer case of judgment and discretion being exercised here because independent judgment cannot be routine or clerical, which means there cannot be only one obvious or self-evident choice. Here, clearly, there is not only one obvious or self-evident choice as to how to reward the men because Mr. Late chose to do it when they worked a shorter period of time and Mr. Bell chose to do it when they worked a longer period of time. The board has also argued that this authority was not set forth in a policy, but, again, that has not been the requirement that every supervisory function has to be spelled out in a policy. And, again, the evidence does show that numerous supervisors were aware of and exercised this authority. And, by the way, actually, if you look at the supervisor job description, it does say that the supervisor has the authority to motivate, to show leadership, to engage in problem analysis and problem resolution, which is certainly at least consistent with that level of authority to reward the longshoremen to give them extra compensation. So that addresses the issue of rewarding. We think, clearly, the record shows that the authority exists and it has been exercised. Again, frequency is of little consequence. But, in any event, Mr. Late testified that he did it twice a month and Mr. Bell testified that he did it once a month, which, over the years that they held the position, does show frequency. If there are no other questions as to rewarding, I'd like to move on to assignment. Try and keep in mind how much time you have altogether. So, evaluate how many of these things you have time to reach. Go ahead. Sure. I will just address assignment briefly. I'd like to focus on the barge planner position that the supervisor rotates into, because the barge planner really creates the load back plan from scratch. It doesn't come from Salt Lake City. He starts with a blank sheet. He spends all day doing it. And he constructs the entire initial sequence of container moves that the longshoremen will follow. And this is an assignment of significant overall duties, because the assignment is not just to load in containers. The sequence of the load back is absolutely critical and key to the productivity and effectiveness of the operation. And that is exactly what the barge planner does. And it's not ad hoc, because ad hoc suggests it's a one-off kind of decision-making that's not part of an advanced or broader plan. What the barge planner does precisely is create the advanced, broader plan that the longshoremen will end up following as part of the load back operations. And it's clear that there's independent judgment, because he is formulating an opinion by considering and discerning various data. For example, he's got to look at the priority containers based upon customer needs. He's got to look at the containers that may need to be loaded back early, because he has to free up chassis that go back into the container yard. He's looking at containers, which containers can be left behind and which containers need to get onto the barge. If there's a limited number of cell space for containers of that size, for example, 45-foot containers, he's got to make sure, and it's kind of like a puzzle, he's got to make sure that the reefers fit on the barge in a certain way. Is this the one? I'm not sure whether this fits under assignment or responsibly direct. But is this not where the hearing officer concluded that the discharge plan was prepared remotely for the barge planner by Salt Lake? Yes. There's two issues. There's actually two plans. One is the discharge plan and one is the load back plan. So the discharge plan really is just kind of the way the containers are loaded onto the barge. So you're talking now just about the load back plan. I'm just talking about the load back plan. And the record is clear. It's undisputed that the barge planner creates that from scratch, takes the proverbial blank sheet of paper and spends a whole day constructing that entire sequence on his own. And, again, he is forming an opinion as to how to do the load back by comparing and discerning data, those variables that I discussed. And there is also the issue of the stability of the boat, the list and the trim. Granted, there's a software program that assists with that, but all that software program does is it just shows what the boat looks like when the containers are loaded in a certain way. It's still up to the barge planner to make the decision as to how he wants to load it and what is an acceptable degree of list and trim. The terminal manager does not review or approve that load back plan that the barge planner unilaterally creates. Instead, it goes straight to the barge supervisor. And if I could just briefly comment on the barge supervisor, he gets that plan, he is and does deviate from that load back plan quite regularly. And one thing I just want to note that's in the record, for example, in our request for review appendix, pages 44 and 45 and 65, is that the barge supervisor, when the supervisor is now in the barge supervisor position and he's out there on the pier and the longshoremen are there, he actually has the authority to cancel the operations entirely. And that is a very significant power to have. He can decide, and the record relates to particularly instances when weather is an issue, when Mr. Late, when he held the position of supervisor, actually canceled the operations a couple of times due to weather. There is an additional example where the supervisor, Llewellyn Lee, was also at that crossroads. And we know that because he actually initiated a discussion with a terminal manager. And he said, hey, we've got a situation here. We've got a broken crane. We've got inclement weather with thunder and lightning. And we've got grumbling longshoremen. We need to make a decision. And what does the terminal manager say to the supervisor? He says, quite literally, you make the call. And Supervisor Lee makes the call. He decides to continue the operations. But he clearly had the authority to call the operations off. That was expressed in what the terminal manager was telling him. And, again, we have evidence where Supervisor Late actually canceled the operations. And this is an example of independent judgment. He's forming an opinion by comparing and discerning data. You've got the broken equipment. You've got weather. And unless you've got a hurricane on the Saffir-Simpson scale, you've got various degrees of weather, perhaps similar to what this panel does when you've got a snow day and you have to decide whether the courts can have oral argument. That's a good thing we had argument because it turned out not to be a snow day. But you're now more than three minutes over. Okay. Thank you very much. Oh, I'm sorry. Judge Henderson has a question. Okay. Leaving aside the dissent characterization of one terminal manager able to direct 34 longshoremen who are separated by 75 miles, I think the regional director's use of quarterback is telling. And I'm trying to figure out how if you had a team of 34 football players and they were longshoremen and you had no quarterback, how the game would be played. And even if you divide these longshoremen, 17 at each terminal, and with the terminal managers maybe directing one remotely and present at the other one, how if you didn't have these supervisors, these 17 football players, longshoremen, could figure out what to do? Well, we agree with that, Your Honor. I mean, certainly the role of the quarterback is important, and the regional director himself did characterize the supervisors as quarterbacking the operations. And also, for example, that things like the operations and the loadback do frequently change. All of that is important because the terminal manager, who is the highest authority on the Big Island, is only there on weekdays, business days. He's not there on nights. He's not there at any point on the weekends. And he doesn't go to the Kauai High Court, which is 75 miles away. So we agree that the quarterbacking by the supervisors is a significant finding by the regional director in Matson's favor, and it does really support their supervisory authority. Thank you. Well, now let me ask a question. Isn't your argument directly in conflict with the law of the circuit? In VIP health, didn't we directly conclude that the presence or absence of somebody characterized as supervisor is not within the statutory definition? I'll just read to you. VIP argues that the field nurses must be supervisors because if they are not, VIP is left without any on-site supervision of the HHAs. This argument is without basis in the statutory definition of supervisors. Congress did not direct that the NLRA be interpreted such that there must be supervisors in every workplace. Right. It's not an absolute requirement, as Your Honor has indicated. But we think that in addition to all the evidence that I've cited in our briefs and that I've mentioned earlier today, that the fact that they are the highest authority for much of the time does support the fact that they are statutory supervisors. It's not essential, but it does support it. You're not asking us to overturn VIP, then? No, we're not. But we do think that the facts support the core primary indicia of supervisory status. Okay, thank you. We'll hear from the NLRB. May it please the Court, my name is Micah Jost for the Labor Board. I'd like to begin by picking up where the Court left off. It is indeed the position of the Board and the longstanding position of this Court that the absence of a supervisor during certain times at any operation does not automatically convey supervisory authority on the highest person present. In that regard, of course, there's the VIP Health Services case. I'd also point to the oil workers case in which there was a helium refinery operating 24-7, often without management on site, that did not transfer supervisory authority to the highest individuals. There are numerous other cases. Can you respond to the two arguments that were made on award and assignment? Certainly, Your Honor. With regard to assignment, first of all, I would note that any claim that the barge planner engages in assignment was waived. There's no clear argument that when he is laying out, in the company's opening brief, that when he is laying out where containers will go and what sequence they will go in, the company didn't argue that that constitutes assignment. But even if they had... That explains why I was unable to locate the argument. Right, and if you look at the decision and direction of election, the regional director only addressed the question of assignment with regard to the timekeeper dispatcher, who is, of course, the individual who does schedule the employees. And it's really about scheduling employees. It's not about laying out operations. There are numerous cases where you have high-level individuals in a complex operation coordinating or planning where things will go. Cases like NSTAR, Northeast Utilities, Exxon Pipeline. And yet, if those people are not choosing individual statutory employees to carry out those tasks and assigning them, there is no assignment within the meaning of Section 211. So that's the circumstance that we have here. With regard to rewarding, there was a question as to the Board's position on the authority of former individuals versus current individuals. And it is the Board's position, as explained in Avantik-Wilson and as explained and upheld by the Seventh Circuit in Loporex, that there's no particular weight. The Board need not give any particular weight to testimony of former employees about what they did in the past or whether they exercised independent judgment in doing so. What's the reasoning for that distinction? The reasoning, I think, is that when the Board is considering the supervisory status of individuals, it's looking at who is currently in the classification. In this case, the two individuals who testified about what they had done in the past went on to become terminal managers. They left the classification, and it's unclear. There's no tangible evidence showing that anyone else, no tangible examples, to use the court's language from oil workers, of anyone else in the unit having engaged in these same purportedly supervisory endeavors. I say both Leight and Bell, or neither one, as it was current at the time? That's correct. As opposing counsel explained, Leight had left, I believe, five weeks approximately before the hearing, the other individual a slightly longer period. I would note, however, that at Joint Appendix 213, Leight testified that, quote, it's been a while when, attempting to explain how often he had tacked on time, he had trouble recalling when he had actually done so or under what conditions because, as he said, it had been a while. So with regard to Bell as well, there's no testimony about when he had engaged in the purportedly supervisory task of tacking on time. So it could have been a period of months. It could have been a period of years. And the board was entitled, within the large measure of discretion that it enjoys in these cases, to focus on the testimony of a current individual, Mr. Nehe Pali, who testified that he was never told he could do this and that he never had done so and that he wasn't aware of the criteria that he supposedly would be free to use for doing so. Again, the Loporex and Evonne Wilson cases. Could you address the quarterback analogy that Judge Henderson pointed us to? Sure. How do you respond to that? In that regard, it's well established in, for example, in the Bresco Tug case that this court recently enforced that even if an individual is said to be in charge, so even if there is no one, once again, if there's no one higher in the particular workplace at a particular time, that doesn't mean that that person is exercising statutory supervisory authority. It may be that the directions of a mate who's in charge or a captain who is in charge of a vessel, their direction certainly must be followed, but that does not mean that they are engaging in statutory responsible direction and that they are doing so with independent judgment, nor does it mean that they are assigning and doing so with independent judgment. So, again, it's a... So would you say a quarterback does not responsibly direct the offensive team? I admit, Your Honor, to a limited knowledge of the details of how a football team operates. I'm sorry, Your Honor? She said it can't be as limited as hers. Well, I would not read too much into the sort of passing analogy that the regional director made to the role of a quarterback in a football team. No, but I do because it's telling in that he is looking at this supervisor and trying to come up with a way to describe it, and he says he's like the quarterback, and to me the quarterback is out on the field calling the plays, directing where the players go and so forth, which is what it seems like these supervisors are doing at the two terminals. And, Your Honor, I'm not aware of any board case determining the supervisory status of a quarterback, and what we have to look to instead in this case is the tangible evidence, the tangible examples that the company introduced, and we have to look at the actual terms of the statute and the subparts within each element. This is really dangerous. Don't actually quarterbacks call plays that are directed by the offensive coordinator beforehand? Again, Your Honor, I have to plead the case. Is there any authority here, any evidence here, that the Stevedores had corrective power over? No, Your Honor. If we're turning to the responsible direction. And is that a required element? That is a required element that the board established in Oakwood that in order to show responsible direction, first of all there must be directing, which the board has defined as having, in the antiquated terms of old decisions, men under him. So not only is there direction of men under the individual, there also must be responsibility, which is a two-part inquiry under the board's case law that requires both authority to impose corrective action to require that directions are followed and the potential for adverse consequences should those instructions not be followed. Oh, and of course there has to be independent judgment as well. In arguing that these individuals engage in responsible direction, the company failed to outline any clear argument with regard to corrective action. In its reply, it tries to make up for that default by pointing to incident reports, which are merely reportorial, as their title indicates. There are multiple cases that have rejected the proposition that the authority to write someone up or to report their conduct in that way constitutes corrective action, specifically locorex from the Seventh Circuit and Northeast Utilities from the First Circuit. Can I get back to the quarterback thing? Although I'm intrigued by Judge Griffith's point that quarterbacks now actually don't quarterback anymore, they just relay instructions from the sidelines. But leaving that aside, the director's use of the metaphor is immediately followed by a paragraph explaining why the person is not a supervisor. Right after he says there's no question that the work of the petition for employees is to quarterback the cargo operations, he then goes on and says, however, the discharge plan is prepared remotely for the barge planner. The barge planner relies heavily on a software program. While circumstances may sometimes require a change, the record establishes the work in all respects is routine. And then it goes on and says the operation involves the same repetitive work performed by the same skilled workforce on the same two vessels day in and day out. So whatever he meant by the metaphor of quarterback, he explains why, at least in his understanding, maybe he has a bad understanding of what a quarterback is too, but he explains why this doesn't constitute supervision. It's not just that he says quarterbacking isn't enough or anything like that. I think that's precisely correct, Your Honor. Again, the regional director here took the actual terms of the statute and applied them to the detailed factual record here, and the full extent of the analysis does go far beyond the simple use of that term. So again, with regard to the primary argument and issue here, which is rewarding, we have no evidence of current individuals exercising that authority, and the board is entitled within its discretion to privilege the evidence of the individual here, Nehepali, who explicitly denied having ever been told. As the courts have held the Fifth Circuit in ADCO and the board as well, if an individual is never informed that they possess supervisory authority, they are a rank-and-file employee. If the court has no further questions, then... I do have one, and that is, we have precedent that says the board is supposed to at least take into account a dissenting member's position, and here the dissenting member found it either impossible or unlikely. I can remember which was used, that one terminal manager in one terminal directs 34 men, some of whom have to be in the other terminal 75 miles away, without any supervisory help by the seven supervisors. So I'd like to have you address that. Your Honor, I have three points in response. First of all, as we noted in our brief, Section 10E precludes the court from considering the company's belated argument based on the member Miskimara's dissent here. It's not enough for the board to discuss an issue or to have a dissenting member raise it, and I don't think the court held otherwise in Hawaiian dredging, which the company relies on. Moreover, substantively, the board did actually reference its prior decision in Buchanan Marine, where it exhaustively went through and explained why member Miskimara was incorrect. And why the board did not adopt his view. The board's not required to lay out its reasoning in full verbatim form in every single decision. It can simply reference its precedent. So just to be clear about this, Miskimara's dissent in this case is the same as his dissent in Buchanan, and in Buchanan, the board extensively responds to it. That's correct, Your Honor. He advocated for the same three-part test which the board concluded in Buchanan has no basis in the statutory language, and as I discussed earlier, that determination is consistent with this court's precedent. But again, as I was discussing at the beginning, there are numerous cases where you have a plant that is unattended for significant periods of time, and you have many people here. We have 13 to 17 people for a barge operation. And there are many cases with more people, more statutory employees, who are without statutory supervision, even if they have other people running their work. In that regard, I point to the Pactel case from the Fourth Circuit where there was a recycling plant with 22 to 40 employees who were unsupervised during certain shifts. The KDFW TV case from the Fifth Circuit, there were 81 employees at a TV station without supervision for significant periods of time. And the list goes on and on. But the basic point is that the statutory terms of Section 211 do not necessarily map directly onto the common sense or sort of ordinary understanding of people when they talk about somebody being in charge or somebody providing directions that other people have to follow.  under the board's precedent or this court's precedent to being a statutory supervisor under the Act. Okay, thank you. Judge Anderson, do you have any further questions?  Okay, thank you. Thank you, Your Honors. Is there time? We'll give you another minute. Your Honors, I think just a couple of points. Not to further belabor the sports analogy, but with regards to the barge planner, I actually think the barge planner is more like the coach of the operations because he creates the entire plan, that initial plan that will form the structure of the entire loadback operations. And that's really along the lines of what a coach does. So it's arguably, I would submit, actually a higher level of authority in terms of that quarterbacking analogy. The barge planner is really like a coach. Now, the barge supervisor is like a quarterback, but he's really calling audibles, right? So he's not just following directions, he's calling audibles. Just to let the record note, Judge Anderson is also laughing. He brought me completely. He's making the sort of on-the-field, game-time decisions about what to do with the operations, how to deviate from the loadback plan, as again, whether to cancel the operations. Just going to the one other point about whether the individuals hold the position at the time of the hearing, again, this Court has not held a bright-line rule, and it's really the position, not the person, that we're looking to for the authority. And the evidence does show in this particular case that that position has that authority. And again, it would be extremely form over substance to say that just because Mr. Lake did not hold that position at the time of the hearing, he gets discounted. He held that position one month before the hearing. Had he simply delayed his promotion or his change of assignment by a month, he would have been a supervisor at the time of the hearing, and it would be quite arbitrary to say that that makes all the difference in the world. Thank you very much. We'll take the matter under submission. We'll take a brief break.
judges: Garland, Henderson, Griffith